# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3679
No. 16-3872

_____

HIP, Inc., fka Unitherm Food Systems, Inc.

*Plaintiff - Appellant/Cross-Appellee*

v.

Hormel Foods Corporation, et al.

*Defendants - Appellees/Cross-Appellants*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 18, 2017
Filed: April 18, 2018

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Hormel Foods Corporation is a Delaware corporation with its principal place of business in Minnesota that manufactures and markets meat products. In early 2007, Hormel sought an improved method of producing precooked bacon, which it was then producing in continuous commercial microwave ovens and selling into retail

and foodservice markets. On July 20, Hormel entered into a Mutual Confidential Disclosure Agreement (the "MCDA") with HIP, Inc. (formerly Unitherm Food Systems, Inc.) ("Unitherm"), an Oklahoma Corporation that develops cooking processes and sells equipment including commercial ovens. On September 25, they entered into a Joint Development Agreement (the "JDA") incorporating the MCDA. On April 1, 2010, Hormel terminated the JDA. In September 2014, Unitherm commenced this diversity action alleging, as relevant here, that Hormel wrongfully terminated the JDA and breached the MCDA. Hormel counterclaimed, alleging that Unitherm breached the JDA and seeking a declaratory judgment that Hormel owns the patented "Unitherm Process" for precooking bacon in a spiral oven. The district court[1] granted summary judgment, dismissing Unitherm's breach of contract claims and Hormel's breach of contract and declaratory judgment counterclaims. They cross appeal these rulings. We affirm.

## I. Background.

By 2005, Hormel had identified superheated steam as a way to improve precooked bacon quality and began work to develop a superheated steam process for cooking bacon. In 2007, Hormel considered partnering with one of two commercial oven manufacturers that offered spiral ovens for cooking meat products with steam, Unitherm and JBT Corporation (formerly FMC FoodTech). Unitherm's owner, David Howard, had developed the "Unitherm Process" suitable for producing precooked bacon in a spiral oven. In a July 10 "generic" discussion of ovens and products, Howard urged Hormel to consider using superheated steam in a spiral oven to produce precooked bacon. The next day, Hormel met with JBT to test cook chicken in JBT's spiral oven. They test cooked a small amount of bacon.

---

[1] The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

-2-

On July 20, at Hormel's invitation, Howard gave a one-hour presentation of Unitherm's new process for cooking bacon in a spiral oven using superheated steam at Hormel's main offices in Austin, Minnesota. Before the meeting, the parties signed the MCDA, which Hormel prepared. On September 25, the parties entered into the JDA, with the stated purpose of developing "the Project." The meaning of that term is a key part of the issues on appeal. During the effective period of the JDA, Hormel and Unitherm conducted tests for cooking bacon in a mini test spiral oven owned by Unitherm, which Hormel leased in July 2008 to continue work on the Project.

On December 5, 2007, JBT issued a press release regarding the use of its spiral oven for producing precooked bacon. Concerned JBT might attempt to patent the concept, Unitherm filed a process patent application for the Unitherm Process in January 2008. Hormel terminated the JDA on April 1, 2010. Before termination, Hormel had experimented with microwave preheating of bacon before precooking in a superheated spiral oven. After termination, Hormel purchased the spiral test oven it had leased from Unitherm. In August 2011, Hormel filed an application for a "Hybrid Process" patent for cooking bacon by preheating it in a microwave oven and then running it through a spiral oven filled with superheated steam. The application identified the spiral test oven purchased from Unitherm as the oven used to develop that process. In January 2012, Hormel and JBT entered into a contract for "the development (design and build) of an oven by JBT for Hormel Foods' patent-pending technology of cooking bacon." For this purpose, JBT modified its GCO-II spiral oven by "reverse engineering" the Unitherm test oven. Hormel purchased the resulting commercial oven from JBT in 2013 and began marketing a new precooked bacon product called "Bacon1" in 2014, using the Hybrid Process.

Unitherm commenced this suit in September 2014, alleging breach of contract, misappropriation of trade secrets, and unjust enrichment and seeking an accounting and a declaratory judgment that it owns the Hybrid Process disclosed in Hormel's pending patent application. Unitherm claimed that Hormel wrongfully terminated the

JDA without notice, failed to share information, misappropriated the Unitherm Process for its own commercial purposes, and breached the MCDA by disclosing details of the Unitherm Process and test oven to JBT and reverse engineering the test oven. Hormel's counterclaim alleged that Unitherm breached the JDA by failing to assign the Unitherm Process to Hormel after Hormel purchased the test oven, and sought a declaratory judgment that Hormel owns the now-patented Unitherm Process.

The district court initially dismissed Unitherm's misappropriation of trade secrets and accounting claims because the alleged trade secrets were made public in Unitherm's patent application. After discovery, both parties moved for summary judgment on their respective breach of contract and declaratory judgment claims and on Unitherm's unjust enrichment, claim. The district court granted summary judgment, dismissing Unitherm's breach of contract and unjust enrichment claims and Hormel's breach of contract and declaratory judgment claims.[2] Both parties appeal.

## II. Unitherm's Breach of Contract Claims.

Unitherm argues the District Court erred in granting summary judgment dismissing its claims that Hormel breached the JDA and the MCDA. We review the grant of summary judgment *de novo*, including the district court's interpretation of state law. Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1147 (8th Cir 1998).

---

[2]The parties subsequently moved to dismiss without prejudice remaining claims regarding ownership of the Hybrid Process. In response to our inquiry at oral argument, they explained these claims were not dismissed to evade the final order doctrine, but because Hormel's Hybrid Process patent application remains pending. They assured the court the dismissed claims will not be revived after this appeal. We are satisfied the cross appeals seek review of a final order within our jurisdiction under 28 U.S.C. § 1291.

Minnesota law governs these claims.  "In order to state a claim for breach of contract, the plaintiff must show (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."  Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011).  The Supreme Court of Minnesota has repeatedly held that "when a contractual provision is clear and unambiguous, courts should not re-write, modify, or limit its effect by a strained construction."  Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 364-65 (Minn. 2009), citing cases.  "Unambiguous contract language must be construed according to its plain and ordinary meaning."  Mapes v. MTR Gaming Grp., Inc., 299 F.3d 706, 707 (8th Cir. 2002).  We determine the plain and ordinary meaning of contract language by "reading it in the context of the instrument as a whole and viewing each part of the contract in light of the others."  Olympus Ins. Co. v. AON Benfield, Inc., 711 F.3d 894, 898 (8th Cir. 2013) (applying Minnesota law).  We consider extrinsic evidence only when the language of the contract is ambiguous.  See id.; Dykes v. Sukup Mfg. Co., 781 N.W.2d 578, 582 (Minn. 2010); Mapes, 299 F.3d at 707.

**A. Breach of the JDA.**  Unitherm alleges that Hormel wrongfully terminated the JDA on April 1, 2010.  Our consideration of this issue must focus on a number of provisions in this three-page agreement.  First, the introductory recital:

> HORMEL and UNITHERM would like to work together to develop an oven that uses very high (approaching 100%) steam levels for cooking. This oven process would initially be focused on producing bacon. Hormel has developed a prototype high steam level oven that produces such bacon and would like to work with Unitherm to develop commercial ovens using high steam levels which would be exclusive to Hormel ("The Project").

Next, a number of operating provisions:

1.  Sharing of Information.  HORMEL and UNITHERM shall share information and ideas to assist in the development of the Project.

2.  By HORMEL.  During work on the Project, HORMEL shall make available equipment, source product and technical personnel for the Project, including defining Project requirements.

3.  By UNITHERM.  During work on the Project, Unitherm will . . . commit adequate resources to develop the Project to produce a commercially-viable end product with all due haste.

5.c.  Exclusivity.  Following completion of a commercially viable application of the Project, the parties will negotiate an agreement by which UNITHERM will be the exclusive supplier to HORMEL of equipment related to the Project for an initial period of five (5) years.

And finally, the termination provision Hormel invoked in terminating the JDA:

6.b.  Termination.  . . . Either party may terminate this Agreement if, after reasonably adequate development work and testing has been done, a commercially viable Project has not resulted, upon providing at least thirty (30) days prior written notice.

The district court granted summary judgment dismissing this claim because no "commercially viable Project" had resulted after reasonably adequate development work and testing.  The court emphasized that the last sentence of the above-quoted recital defined the "Project" as "concern[ing] the development of a commercial oven, not a cooking process."  Because "the term falls within the period of the last sentence," the court reasoned, "it refers only to that sentence[, which] discusses developing commercial ovens, not oven processes."  This analysis is consistent with the contract interpretation principle that a "defined term is defined by tucking it at the

end of the definition, in parentheses." Olympus Ins. Co., 711 F.3d at 899. Summary judgment is appropriate, the district court concluded, because "[t]here is no evidence the parties developed ovens, let alone commercially viable ones."

Focusing on the express reference to "oven process" in the second sentence of the recital, Unitherm argues, as it did in the district court, that the contract term "Project" included the development of cooking processes. Unitherm's theory is that, because there was adequate evidence that it brought a commercially viable Unitherm Process to Hormel at the start of the JDA, and the parties applied and refined that process to produce good tasting bacon in the leased mini spiral oven prior to termination, Hormel wrongfully terminated the JDA.

We conclude that Unitherm's dissecting of the JDA recital mistakenly elevates semantics to an art form. The first sentence of the recital plainly declares the purpose of the JDA -- "to develop an oven that uses very high (approaching 100%) steam levels for cooking." The third sentence explains that Hormel has "a prototype high steam level oven that produces such bacon" but wants "to work with Unitherm to develop commercial ovens using high steam levels which would be exclusive to Hormel." Unitherm relies on the second sentence of the recital stating that the "oven *process* would initially be focused on producing bacon." However, the district court's interpretation of the term "Project" is consistent with the plain meaning of the entire recital read in the context of the operative provisions of the JDA. The recital clearly defined the Project as developing an oven using a particular process. Paragraph 3 reinforced this interpretation, obligating Unitherm to help "develop the Project to produce a commercially-viable end *product*." (Emphasis added.) Paragraph 5.c. then spelled out Unitherm's reward: upon "completion of a commercially viable application of the Project," Hormel committed to negotiate an agreement giving Unitherm, an oven manufacturer, the exclusive right to supply "equipment related to the Project" for five years. The plain meaning of these provisions is that the term "commercially viable Project" in paragraph 6.b. means, in

the words of the recital, a commercially viable oven for making bacon "using high steam levels which would be exclusive to HORMEL."

In addition to urging an implausible definition of the term Project, Unitherm totally failed to introduce evidence addressing the critical term "commercially viable" in paragraph 6.b. "Commercially viable," a term used in a variety of contexts, has a plain meaning -- "the ability of a business, product, or service to compete effectively and to make a profit." CAMBRIDGE BUSINESS ENGLISH DICTIONARY.[3] "'Commercial viability' means the ability to sell a device at a profit and to afford the development and continuation of an ongoing business." Cyrix Corp. v. Intel. Corp., 846 F. Supp. 522, 541 (E.D. Tex. 1994). Or, as the Second Circuit said more recently, "'commercially viable' -- read 'profitable.'" Beardslee v. Inflection Energy, L.L.C., 761 F.3d 221, 229 (2d Cir. 2014). It is also a term that can be objectively proved. For example, in one securities fraud case, the court noted that a "commercial viability determination is the result of a cost/revenue analysis that may be assessed using quantitative data." In re Novagold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 302 n.21 (S.D.N.Y. 2009).

Here, Unitherm presented no evidence countering Hormel's decision that "after reasonably adequate development work and testing has been done, a commercially viable Project has not resulted." The JDA explicitly gave Hormel the task of "defining Project requirements," so Unitherm needed strong evidence discrediting Hormel's decision that the requirements of Paragraph 6.b. had not been met. Yet, there was no evidence work on the Project developed an oven capable of producing *commercial* quantities of bacon using the process Unitherm brought to the Project. Indeed, in his lengthy deposition, Howard admitted that no bacon produced by a spiral oven using the Unitherm superheated steam process has ever been sold in the

---

[3]https://dictionary.cambridge.org/us/dictionary/english/commercial-viability (last visited Apr. 2, 2018).

United States. Evidence that those participating in a test panel opined that the mini spiral test oven produced bacon samples tasting as good as microwave precooked bacon already on the market was not evidence that a high quality new product could be profitably produced in large quantities in a commercial oven. Nor was there evidence that Costco, for example -- Hormel's major customer for microwave precooked bacon -- could be persuaded to make a major product change to precooked bacon produced in a spiral oven using superheated steam. For these reasons, we conclude that Unitherm failed to present evidence permitting a reasonable jury to find that Hormel wrongfully terminated the JDA.

**B. Breach of the MCDA.** Unitherm argues that Hormel breached the MCDA, after it terminated the JDA but while the five-year MCDA was still in effect, by (1) disclosing to JBT confidential information relating to the Unitherm Process, and (2) permitting JBT to reverse engineer the mini spiral test oven to develop the commercial oven Hormel now uses to produce Bacon 1 using Hormel's Hybrid Process. The district court concluded Hormel did not breach the MCDA because confidential information within the meaning of the MCDA was not disclosed to JBT. First, the district court reasoned, the information Hormel disclosed to JBT was disclosed in the Unitherm Process patent application and therefore fell within the "public knowledge" provision in the MCDA.[4] Second, permitting JBT to reverse engineer the mini spiral test oven did not breach the Use of Confidential Information provision because the mini oven was not confidential information: before the alleged breaches, Unitherm marketed the same oven and displayed it at a trade show; in addition, Hormel had purchased the test oven from Unitherm after terminating the JDA.

---

[4]For the same reason, the district court dismissed Unitherm's theft-of-trade-secrets claim earlier in the litigation, a ruling Unitherm has not appealed.

(1) <u>The Unitherm Process.</u>  Unitherm claims that Hormel's work with JBT to replicate the Unitherm Process after Hormel terminated the JDA in 2010 breached the MCDA's confidential information provisions.  But the Unitherm Process was published in Unitherm's process patent application filed on January 11, 2008.  The MCDA specifically exempts from the definition of Confidential Information any information that the recipient "can demonstrate . . . is or becomes public knowledge through no breach of this Agreement."  Unitherm argues the district court erred in relying on this provision because Unitherm was forced to file its patent application as a result of Hormel's earlier (time-barred) breach of the MCDA when Hormel disclosed the confidential idea of using a spiral oven to produce precooked bacon to JBT before Unitherm and Hormel entered into the MCDA.  This far-fetched contention is contrary to the express terms of the contract.

The summary judgment record established that, prior to the signing of the MCDA, Unitherm's Howard revealed to Hormel only the general idea of using a "spiral oven using superheated steam to cook bacon."[5]  Spiral ovens were already on the market, and as early as 2004 Hormel began researching and working with other companies to develop a process by which precooked bacon could be produced with superheated steam.  Hormel did not disclose Confidential Information, as that term was later defined in the MCDA, if it investigated whether a rival oven manufacturer was pursuing this concept before inviting Howard to make a full presentation of what Unitherm would propose.  The Unitherm Process did not became public information because Hormel breached a contract not yet signed or even negotiated.  Thus, Hormel did not breach the MCDA by disclosing to JBT, after Hormel terminated the JDA, public information Hormel acquired while the JDA was in effect.

---

[5]At the motion to dismiss stage, Unitherm admitted it only disclosed to Hormel a "general concept . . . but no details of the Unitherm Process" before the MCDA was signed, and that "[t]he breach of contract occurred at the very earliest on April 1, 2010, when Hormel unilaterally terminated the JDA with the hidden agenda to keep the fruits of Unitherm's Process for itself."

(2) <u>The Test Oven.</u> Unitherm argues Hormel breached the MCDA by allowing JBT to examine and reverse engineer the mini spiral test oven Hormel purchased from Unitherm after terminating the JDA. The MCDA provides that "Confidential Information" "should be accompanied by a statement that the information is Confidential Information." Because Unitherm presented no evidence the mini oven was marked as Confidential Information, the district court properly looked, as the MCDA required, to whether "the circumstances would lead a reasonable person to believe that such information may be Confidential Information." The court concluded that, because Hormel owned the mini spiral test oven and Unitherm had displayed and marketed it at a trade show, the test oven did not qualify as Confidential Information. We agree. Unitherm argues the district court should not have "ignore[d] the record evidence showing that Hormel wrongfully duped Unitherm into selling the test oven by leading Unitherm into thinking Hormel had abandoned the Project." However, Hormel did not wrongfully terminate the JDA and was under no contractual duty to disclose to Unitherm whether it intended to continue exploring a commercially viable method to produce precooked bacon using a process that included superheated steam in a spiral oven.

**C. Unitherm's Discovery Appeal**. Unitherm argues the district court erred in denying its request to discover information relating to profits Hormel earned selling its Bacon1 product. We reverse a district court's discovery rulings only for a "gross abuse of discretion resulting in fundamental unfairness in the trial of the case." <u>Tenkku v. Normandy Bank</u>, 348 F.3d 737, 743 (8th Cir. 2003) (quotation omitted). Unitherm argues it "should be allowed to conduct discovery showing the amount of damages it has suffered as a result of Hormel's breach of the MCDA." However, as Hormel did not breach the MCDA, any discovery related to Unitherm's alleged damages is of no moment. Refusing to permit this time-consuming discovery into a highly confidential subject was not an abuse of discretion, much less fundamentally unfair.

### III. Hormel's Counterclaims

Hormel cross-appeals dismissal of its contract and declaratory judgment counterclaims, arguing it is the rightful owner of the Unitherm Process and should be declared owner of the Unitherm Process patent. We have Article III jurisdiction over these state law claims. See Diagnostic Unit Inmate Council v. Films Inc., 88 F.3d 651, 653 (8th Cir. 1996). The district court concluded that Hormel has not shown that it owns the Unitherm Process and its patent. We agree.

Hormel argues that it owns the Unitherm Process because it falls within the definition of "Inventions" in the JDA: "all discoveries, improvements, know-how, and ideas . . . relating to the Project developed after the effective date of this Agreement." Paragraph 5.a.(iv) of the JDA provided:

> HORMEL will own all Inventions . . . defined herein. UNITHERM will execute such documents as are necessary to perfect [Hormel's] ownership, but no such execution will be required until Hormel executes a purchase agreement for a test oven. Should no such purchase agreement be executed, UNITHERM will retain ownership rights to "Inventions" conceived and reduced to practice solely by UNITHERM and will retain joint ownership of "Joint Inventions."

Hormel alleged that the Unitherm Process was jointly developed by the parties during the JDA. Therefore, Hormel owns the Unitherm Process, and Unitherm breached the JDA when it failed to assign ownership of the Unitherm Process and its patent to Hormel after it purchased the mini test oven.

There is more than a little contradiction and irony in Hormel arguing on the one hand that it did not wrongfully terminate the JDA because the "Project" related only to development of an oven, and on the other hand that Hormel now owns the Unitherm Process because it was an Invention "related to the Project." In any event,

-12-

we agree with the district court the summary judgment record refutes the latter assertion. It is undisputed that Unitherm's Howard brought a developed "Unitherm Process" to Hormel when they entered into the JDA in September 2007. Some months later, Unitherm applied for the Unitherm Process patent. Hormel declined invitations to add claims to the application and presented no evidence that any improvements in the Process as patented were developed as part of the Project.

Given the complexities of producing commercially viable precooked bacon, we have no doubt the parties worked on modifications of the Unitherm Process while the JDA was in effect. Had these efforts resulted in "completion of a commercially viable application" of the Project, Paragraph ¶ 5.c. provided for negotiation of an agreement making Unitherm exclusive supplier of ovens and equipment for five years. In that case, Hormel clearly would have owned the "Inventions" producing this result. However, when the parties' efforts to develop the Unitherm Process into a commercially viable application did not succeed, Hormel terminated the JDA and purchased the mini test oven *after termination*. In these circumstances, Paragraph 5.a.(iv) provided that "UNITHERM will retain ownership rights to 'Inventions' conceived and reduced to practice solely by UNITHERM." The Unitherm Process, as patented, was conceived by Unitherm and sufficiently reduced to practice to induce Hormel to enter into the JDA. In these circumstances, we agree with the district court that no reasonable jury could find that Hormel became the rightful owner of Unitherm's patented process as a result of the parties' failed joint effort to work with that process "to develop," in the words of the recital on which Hormel relies, "commercial ovens using high steam levels which would be exclusive to HORMEL."

The judgment of the district court is affirmed.

_____